SUSAN KLEN,               )
                       )
       Plaintiff,         )
                       )
       v.              )    No. 07 C 6280
                       )
MICHAEL J. ASTRUE,     )    Judge Nan R. Nolan
Commissioner of Social Security,  )
                       )
       Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan Klen claims that she is disabled due to diabetes, neuropathy, asthma, allergies, obesity, sleep apnea and orthopedic pain. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, Ms. Klen's motion is granted in part and denied in part, and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Ms. Klen applied for DIB on November 19, 2003, claiming that she became disabled on May 15, 2003 due to diabetes, neuropathy, chronic obstructive pulmonary disease ("COPD"), asthma, allergies, chronic bronchitis, obesity, sleep apnea and orthopedic pain. (R. 139-40, 152.) The application was denied initially on March 8, 2004, and again on reconsideration on October 5, 2004. (R. 39-48.) Ms. Klen appealed the decision and requested an administrative hearing, which was held on January 3, 2007.[1] (R. 14, 49, 352.) On February 13, 2007, Administrative Law Judge Paul

---

[1]    Ms. Klen first requested a hearing in December of 2004, and Administrative Law Judge Lloyd Gill issued notices for three hearings between May and November 2005. It is not clear whether ALJ Gill ever conducted a hearing during that time, but the parties agree that he never

R. Armstrong (the "ALJ") denied Ms. Klen's claim for benefits, finding that she is capable of performing a significant number of unskilled, sedentary jobs available in the national economy. (R. 14-25.)

The ALJ found that Ms. Klen's asthma, COPD, right carpal tunnel syndrome, arthritis in left knee, bilateral heel spurs, degenerative disc disease of the cervical spine and obesity are severe impairments. The ALJ also acknowledged that Ms. Klen was diagnosed with depression, but concluded that the condition has no more than a minimal effect on her ability to do basic work activities. (R. 16, 17.) The ALJ determined that Ms. Klen has the residual functional capacity to perform sedentary work involving no pushing/pulling with her right arm; no work at unprotected heights; no work around dangerous machinery, open flames or bodies of water; and no concentrated exposure to noxious fumes, odors or other respiratory irritants. (R. 20.) Ms. Klen now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

**FACTUAL BACKGROUND**

Ms. Klen was born on February 29, 1964 and was 42 years old at the time of the hearing before the ALJ. (R. 140.) She has a bachelor's degree in business administration, and a sustained work history as a financial analyst. (R. 153, 358, 405.) She is married and lives with her husband in Joliet, Illinois. (R. 363-64.)

**A.    Medical History**

Ms. Klen's first relevant medical records date back to March 2003. A treatment note from March 3, 2003 stated that Ms. Klen had diabetes and borderline hypertension, with some atypical chest pains. An EKG was "unremarkable," as was her overall exam. (R. 198-99.) On March 22, 2003, Ms. Klen had a diagnostic image of her chest due to pain and diabetes mellitus. The image showed "[n]o radiographic evidence for acute cardiopulmonary disease." (R. 191.) A few days later

issued a ruling in this case. (R. 58-73, 77-90, 91-100.)

on March 27, 2003, a cardiac angiogram revealed no significant coronary disease and "[n]ormal LV systolic function." (R. 201-02.) Ms. Klen had an ultrasound of her Achilles tendons on June 10, 2003, which showed "chronic left Achilles insertional tendinosis," as well as a "partial intrasubstance tear at the level of the postosuperior corner." (R. 278.) The test also revealed "left retrocalcaneal bursitis" and "calcinosis involving the right Achilles tendon insertion." (R. 279.)

On August 21, 2003, Ms. Klen had a CT scan of her brain, which was "unremarkable." (R. 210.) The following month, on September 9, 2003, Ms. Klen was admitted to Provena Saint Joseph Medical Center for bronchial asthma with acute exacerbation, and acute bronchitis. She received Levaquin, Albuterol, Atrovent, Advair and Singulair, and was discharged on September 12, 2003 "in a stable condition." (R. 212, 214.) Dr. Sirajuddin S. Khaja found "[n]o acute pulmonary infiltrate" at that time. (R. 216.) On October 17, 2003, Ms. Klen presented to Dr. Michael G. Gartlan with complaints of chronic sinus problems. Dr. Gartlan diagnosed chronic rhinosinusitis with nasal obstruction; allergic rhinitis; probable obstructive sleep apnea; and chronic cough secondary to the allergic rhinitis. (R. 225.) He prescribed Flonase and Astelin, and recommended allergy testing and a sleep study. (*Id.*)

As recommended, Ms. Klen had a sleep study on November 6, 2003. She complained of loud snoring and severe daytime sleepiness, and the test revealed obstructive sleep apnea hypopnea syndrome, as well as "some neuropathy[2] and restlessness in the lower extremities." Dr. Philip S. Leung recommended that Ms. Klen use a nasal CPAP machine, with which she "showed an improvement in sleep continuity and oxygenation." (R. 184-85, 189-90, 208-09, 226-27.) On December 18, 2003, Dr. Gartlan diagnosed Ms. Klen with "[a]llergic rhinitis severe with asthma," and agreed that CPAP was the preferred course of treatment for her moderate sleep apnea. (R.

---

[2] "Neuropathy" causes weakness, numbness, tingling and pain. (http://www.neuropathy.org/site/PageServer?pagename=About_Facts.)

219.)  Dr. Gartlan explained the link between asthma and allergies, but Ms. Klen declined to give away her cats.  (*Id.*)

On February 25, 2004, Dr. Henry S. Bernet completed a Physical Residual Functional Capacity Assessment of Ms. Klen.  (R. 246-53.)  Dr. Bernet found that Ms. Klen suffered from obstructive sleep apnea; poorly controlled diabetes, resulting in "mildly decreased sensation in her arms and hands"; and morbid obesity.  (R. 253.)  He noted her September 2003 hospitalization for an asthma exacerbation, but he also observed that her lungs were clear on recent physical exams, and that she used inhalers as needed.  (*Id.*)  Dr. Bernet concluded that Ms. Klen was capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing, walking and sitting for six hours in an eight-hour workday; pushing and pulling without limitation; and occasionally balancing, stooping, kneeling, crouching and crawling, but never climbing.  (R. 247-48.)  Ms. Klen had no manipulative, visual or communicative limitations, but Dr. Bernet recommended that she avoid all exposure to unprotected hazards due to her severe daytime sleepiness.  Dr. Bernet further found that Ms. Klen needed to avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases and poor ventilation.  (R. 249-50.)  Based on his evaluation, Dr. Bernet opined that Ms. Klen retained the ability for "light work activity with postural and environmental limitations."  (R. 253.)

Ms. Klen next presented to the Loyola University Health System on March 8, 2004 for an apparent follow-up appointment.  Her chief complaint was diabetes mellitus, though she was also diagnosed with hypertension, hyperlipidemia, neuropathy, asthma and sleep apnea.  (R. 254-55.)  The doctor noted that medication provided relief for the neuropathy at that time, and her judgment, insight, mood and affect were all normal.  (*Id.*)  Approximately three months later, on June 2, 2004, Milena Appleby, M.D. completed a Neurological Consultation Report on Ms. Klen at the request of Dr. Khaja.  Ms. Klen presented with numbness and weakness in both hands, with more pain on her right side.  She complained of difficulty writing and an inability to open water bottles, and reported

that the pain "comes and goes." (R. 262.) Dr. Appleby found that Ms. Klen had full muscle strength but decreased sensation "in both median nerve distributions as well as in a stocking and glove pattern." Dr. Appleby diagnosed bilateral carpal tunnel syndrome, and a nerve conduction study (i.e., "EMG in Upper Extremities") was "consistent with mild right median nerve neuropathy due to carpal tunnel syndrome." (R. 262-63.)

More than a year later, in November 2005, Ms. Klen started seeing Connie Vaisvilas-Taylor, LCPC for depression caused at least in part by her chronic pain. Ms. Vaisvilas-Taylor diagnosed major depression, recurrent and severe without psychosis. (R. 321.) Ms. Klen initially presented with a global assessment of functioning ("GAF") score of 50, but by January 5 and 11, 2006 it was up to 60. (R. 321-28.)

On January 18, 2006, Samina Bokhari, M.D. conducted a Neurology Consultative Examination of Ms. Klen for the Bureau of Disability Determination Services ("DDS"). Ms. Klen's chief complaint was pain, numbness and tingling in her hands and feet that was "getting progressively worse" and causing her to wake up during the night. (R. 265-66.) Dr. Bokhari observed that Ms. Klen was morbidly obese and wearing a wrist support on her right hand due to carpal tunnel syndrome and mild right median nerve neuropathy. Ms. Klen also walked with a straight cane due to right knee joint pain dating back to a surgical procedure she had in January 2002. Dr. Bokhari observed palpable spurs in both of Ms. Klen's heels and described her gait as "very antalgic" (i.e., assumed in order to avoid or lessen pain). Ms. Klen experienced discomfort from the heel pain after walking more than 40 feet; limped slightly towards the right side; and had "evident" stiffness and pain in her right knee joint. In addition, she could not stand on her tiptoes or heels, or perform tandem gait. (R. 266, 267.)

Ms. Klen told Dr. Bokhari that the spurs prevent her from walking down stairs, or walking more than half a city block without resting. She also reported that she can climb two to three stairs at a time, but only with the support of a railing. (R. 266, 268.) Consistent with this statement, Ms.

5

Klen was able to climb on and off the exam table with support from the handle of a stepping stool and assistance from the examiner. (R. 268.) Dr. Bokhari found decreased range of motion in Ms. Klen's right knee joint, as well as "[d]ecreased pinprick sensation in glove-stocking distribution." "Vibration sense" and "position sense" were both reduced and/or impaired in Ms. Klen's feet. (R. 268-69.) Ms. Klen had normal hand grip strength bilaterally, however, and she had no problem making a fist with both hands. She was able to perform all hand dexterity maneuvers, including buttoning, zippering, tying shoe laces, opening a bottle, and picking up a small piece of paper from the table, and she was able to write her name in 10 seconds. (R. 268.)

Dr. Bokhari noted that Ms. Klen uses a nebulizer one to two times per week for her asthma, and that her symptoms are "under good control." The doctor also noted a history of diabetes mellitus and sleep apnea, as well as multiple abdominal surgeries on Ms. Klen's liver secondary to her use of oral contraceptives. At the time of the exam, Ms. Klen was taking Albuterol (the inhaler as needed, plus the nebulizer one to times per week); Flonase, Singulair; insulin; amitriptyline; Accupril; aspirin; Vicoprofen for pain; and Zyrtec for allergies. (R. 266.) Dr. Bokhari observed that Ms. Klen was appropriate and polite, and "able to relate clear, concise and coherent medical history without apparent cognitive difficulties." Ms. Klen's affect was normal "without signs of agitation, irritability or anxiety." (R. 267.)

Based on her examination and a review of Ms. Klen's medical records, Dr. Bokhari set forth seven clinical impressions, including (1) "peripheral sensory neuropathy most likely secondary to history of diabetes mellitus which is at times painful and gradually the symptoms are worsening"; (2) right carpal tunnel syndrome; (3) right knee joint osteoarthritis with decreased range of motion and ambulatory difficulties; (4) pain in the heels due to bone spurs; (5) status post abdominal surgery; (6) diabetes mellitus with evidence of peripheral neuropathy and mild diabetic retinopathy; and (7) sleep apnea. (R. 269.)

Dr. Bokhari concluded that Ms. Klen can frequently lift and/or carry less than 10 pounds; sit without limitation; frequently climb; never balance or stoop; and occasionally kneel, crouch and crawl. (R. 271-72.) Dr. Bokhari found Ms. Klen limited in her ability to push and pull using her upper extremities due to right-sided carpal tunnel syndrome and right median nerve irritation. She also found Ms. Klen limited in her ability to walk due to right knee pain with decreased range of motion and heel spurs. (R. 272.) Dr. Bokhari described Ms. Klen's postural limitations as secondary to the pain in her right knee, in both her heels, and in her right hand due to carpal tunnel syndrome. (*Id.*) Dr. Bokhari found no manipulative, visual/communicative or environmental limitations. (R. 273-74.)

On February 1, 2006, Ms. Vaisvilas-Taylor gave Ms. Klen a GAF score of 65. Ms. Klen was receptive to trying Cymbalta to help alleviate her depression at that time. (R. 329.) Throughout February and March 2006, Ms. Klen continued to see Ms. Vaisvilas-Taylor, and she reported on March 20, 2006 that the Cymbalta "seems to be helping to alleviate some of her depression." Ms. Klen's GAF score ranged from 53 to 58 during this period. (R. 330-34.)

Also in February and March 2006, Ms. Klen received physical therapy for pain in her spine, neck and shoulder. The treatment notes indicate that Ms. Klen was taking Motrin, which was "working" as of March 3, 2006. (R. 291-92, 303.) On March 6, 2006, Ms. Klen saw Surender Dhiman, M.D. for severe pain in the shoulder blade and right upper arm. Dr. Dhiman observed excellent range of motion in Ms. Klen's left shoulder, elbow and wrist, but "slight decreased movement of the neck toward the right side." (R. 315.) He noted a "[t]rigger point over the right scapula," but found "[g]ood range of movement in the right shoulder." (*Id.*) Dr. Dhiman ordered an MRI of the cervical spine, which Ms. Klen underwent on March 7, 2006. The test showed some degenerative changes, including generalized disc space narrowing and disc desiccation at the C4-C5, C5-C6 and C6-C7 levels. At the C5-C6 level, Ms. Klen exhibited "[b]ilateral spondylotic protrusions with left paracentral disc protrusion," and "[m]oderate bilateral neural foraminal

narrowing, left greater than right." (R. 277.) Ms. Klen exhibited the same symptoms at the C6-C7 level, though the neural foraminal narrowing was greater on the right than the left. Ms. Klen also had "[e]ffacement of the anterior subarachnoid space at the C5-C6 level." (*Id.*) Based on these test results, Dr. Dhiman referred Ms. Klen to neurosurgeon George DePhillips, M.D. for an epidural injection. (R. 314.)

Before Ms. Klen saw Dr. DePhillips, she first went to the Pain Center of Chicago, LLC on March 15, 2006, complaining of right shoulder pain radiating into her right arm and hand. (R. 318.) She described her pain as constant, severe and excruciating, but she experienced improvement with ice and pressure. (*Id.*) Ms. Klen also saw Ms. Vaisvilas-Taylor on April 11, 2006 and again reported that her depression was not as bad with the Cymbalta. (R. 335.)

Dr. DePhillips examined Ms. Klen on April 12, 2006 for pain in the neck radiating into the right arm and forearm with associated numbness and tingling. Ms. Klen had a cervical epidural steroid injection, "which gave her dramatic relief in terms of her radiculopathy."[3] (R. 311.) Dr. DePhillips reported that Ms. Klen "requires no further treatment as she is neurologically intact and has no radiculopathy." (*Id.*) He agreed that she has "a fairly severe degenerative disc disease and foraminal stenosis bilaterally," which he "believe[d] is the source of her radiculopathy." Dr. DePhillips told Ms. Klen that she is a candidate for surgery, but since she showed improvement following the injection, he recommended that she "wait until her symptoms worsen before considering either additional conservative treatment or surgical intervention." (*Id.*)

Between May 2 and August 9, 2006, Ms. Klen saw Ms. Vaisvilas-Taylor six times. Her GAF score remained constant at 60, and she reported having good days and bad days but still struggling with chronic pain. (R. 336-42.) On September 20, 2006, Ms. Klen's GAF score dropped to 55, and

---

[3] "Radiculopathy" is a term used to describe symptoms of pain, numbness, tingling and weakness in the arms and legs caused by a problem with the nerve roots. (http://www.back.com/symptoms-radiculopathy.html.)

Ms. Vaisvilas-Taylor observed that she "continues to struggle with visibly excruciating pain as well as depression." Ms. Klen told Ms. Vaisvilas-Taylor that she was going to have another epidural injection, but there is no record of such treatment. Nevertheless, Ms. Klen testified at the hearing before the ALJ that she received an injection on October 17, 2006, and again in early December 2006, which gave her relief until Christmas. (R. 343, 400-01.) Between October 4 and November 28, 2006, Ms. Klen's GAF score ranged from 50 to 58. (R. 344-49.) By December 2006, however, her GAF score was back up to 60. Ms. Klen reported that she was reading and visiting with her sister, niece and nephew, but that she still struggled with chronic pain. On December 27, 2006, Ms. Klen told Ms. Vaisvilas-Taylor that she experiences some good days, but that on other days the pain is so severe that she cannot get out of bed even with her medications. (R. 350-51.)

## B.    Ms. Klen's Testimony

In a November 26, 2003 Disability Report, Ms. Klen stated that she stopped working on May 15, 2003 because of difficulty concentrating, dizziness, difficulty breathing, fatigue, inability to sleep at night, constant severe pain and numbness in her hands and feet, frequent asthma attacks, and "general pain all over." (R. 152.) On January 16, 2004, Ms. Klen completed an Activities of Daily Living Questionnaire stating that she could not open jars, separate paper into single sheets, or pick up coins due to poor grip strength and pain in her hands. She was able to wash her body but not her hair because her arms would "go totally numb" when she raised them over her head for more than one minute. Ms. Klen indicated that writing was "extremely painful," and that she needed help carrying bags, groceries and laundry. (R. 161-62.) She "rarely" drove due to constant pain, numbness and fatigue, and she needed support in order to stand, walk and balance. Ms. Klen also reported that she rarely shopped or cooked, and did no household chores. (R. 163.)

Ms. Klen completed a second Activities of Daily Living Questionnaire on August 18, 2004. She reiterated that she could not open jars, separate paper into single sheets, or pick up coins, and she stated that writing "takes a long time" and "is extremely painful." She was able to use some

kitchen utensils for short periods of time, however, and also use the telephone. (R. 181-82.) Ms. Klen stated that she was able to carry bags or groceries a "very short distance with stops to rest," but that she could not do any overhead reaching. She described severe pain in her hands, wrists, right knee and heels, and complained of numbness in her hands, toes and forearms. (R. 181.) She still needed assistance to stand, walk and balance, and she was no longer able to sit for more than 30 minutes at a time due to pain and numbness in her legs. Ms. Klen indicated that she continued to have difficulty driving due to pain, weakness and poor concentration, and could not take public transportation. Ms. Klen also reported that she could only stand for a few minutes at a time due to pain and dizziness, and that she could not do "big" household chores "at all." (R. 182.)

At the hearing before the ALJ, Ms. Klen testified that her left arm is "almost always good," and that she is able to use her right hand "a little bit" when she takes pain medication and is not experiencing numbness. (R. 359.) She was unable to open or close her right hand, or lift her arm over her head that day, but she indicated that this was unusual. (R. 359-60.) Ms. Klen disputed Dr. Bokhari's conclusion that she is capable of making fists with both hands and performing all hand dexterity maneuvers, stating that the doctor never asked her to actually perform "any kind of exercise." (R. 361.) She stated that she can only lift a half-gallon of milk with her left hand, and she has numbness in her right hand due to carpal tunnel syndrome, neuropathy and degenerative discs. (R. 368-69.) Ms. Klen explained that steroid injections help relieve her arm pain for months at a time, and she has received several injections from the Pain Center of Chicago. Physicians at the Pain Center, however, told Ms. Klen that she cannot have more than three shots per year. (R. 373, 401.) She has not followed up with Dr. DePhillips regarding a surgical procedure because she is concerned that her blood is thin; she has been under "too much" general anesthesia; and it may not be successful. (R. 369-70, 373, 401-02.) According to Ms. Klen, Dr. DePhillips has advised her to put off surgery as long as possible because her condition is genetic and will only continue to worsen even after surgery. (R. 402.)

As for Ms. Klen's feet and legs, she testified that she cannot walk due to heel spurs, and that doctors have told her she is not a candidate for surgery.  (R. 363.)  She also cannot bear weight on her right knee.  (R. 368-69.)  Her blood sugar level "swings" due to pain, steroid injections, and Prednisone, which she takes every couple of months when her lungs fill with water.  (R. 366-67.)  She uses an Albuterol inhaler several times a day, and also takes it in nebulizer form three times per week.  (R. 367.)  In addition, she takes medication for severe allergies, diabetes, diabetic neuropathy and pain.  (R. 390-91.)  For her sleep apnea, Ms. Klen uses a CPAP mask but is not always able to put it on due to pain in her hands.  (R. 377.)

Ms. Klen testified that she started seeing a therapist due to her constant pain, and stated that most days she does not get out of bed because "there's just nothing I can do." (R. 372.)  She does do some shopping and cooking when she feels up to it, however, and she drives herself around the neighborhood "just to get out" or to see the doctor.  (R. 364-65.)  She also watches a lot of television and can read a few pages from a book.  (R. 365-66.)  At the same time, Ms. Klen testified that most days she wakes up feeling like she is "drowning," and is under the weight of a "big, sad cloud." (R. 398.)  She also wakes up screaming all night because of arm pain.  (R. 399.)

## C.    Medical Expert's Testimony

Ashok G. Jilhewar, M.D. is board certified in internal medicine, gastroenterology and geriatric medicine, and he testified at the hearing as a medical expert.  (R. 412.)  Dr. Jilhewar opined that Ms. Klen's diabetes is "just fairly controlled," and confirmed that she is morbidly obese, which could exacerbate her diabetes, pain symptoms, heel spurs and carpal tunnel syndrome.  (R. 377, 379, 390.)  He stated that she should not have any daytime sleepiness, however, as long as she uses her CPAP.  As Dr. Jilhewar explained, after December 1, 2003, "we do not have any documentation that the CPAP was not effective or could not be used."  (R. 377-78.)  Dr. Jilhewar generally agreed with Dr. Bokhari's assessment that Ms. Klen would be limited to sedentary work with a restriction to lifting less than 10 pounds.  (R. 374-75, 396.)  At the same time, he did not find

the medical record consistent with Ms. Klen's complaints that she cannot lift her right arm or a gallon of milk. (R. 377, 379-80, 396.) Dr. Jilhewar noted that there were no clinical findings supporting muscle weakness, and opined that the June 2, 2004 EMG conducted by Dr. Appleby did not show evidence of radiculopathy. Rather, the only abnormality confirmed by the test was carpal tunnel syndrome in the right hand. (R. 263, 375-76, 381.)

Dr. Jilhewar agreed that the Pain Center documented radiculopathy, but noted that the physicians there provided no supporting objective clinical findings. (R. 376.) As for Dr. DePhillips's report, Dr. Jilhewar noted that the epidural provided Ms. Klen with good relief, and again stressed the absence of any objective evidence of radiculopathy. (R. 375, 381, 388-89.) Dr. Jilhewar also opined that the March 7, 2006 MRI of Ms. Klen's cervical spine revealed that she only suffers from carpal tunnel syndrome in the right hand. In Dr. Jilhewar's view, the pain purportedly associated with degenerative disc disease and neuroparameter narrowing "can be confused with the carpal tunnel syndrome" and "the ulnar entrapment." (R. 383.)

In reaching his conclusion, Dr. Jilhewar cautioned that he did not take Ms. Klen's depression into account, explaining that "I am not a psychiatrist so I don't know how pain affected" her RFC. (R. 379.)

D.    **Vocational Expert's Testimony**

Grace Gianforte testified at the hearing as a vocational expert ("VE"). She described Ms. Klen's past work as sedentary and highly skilled, noting that financial analysts work in indoor, safe and comfortable offices. (R. 405, 406.) The VE testified that a hypothetical individual who was limited to sedentary work, including no pushing or pulling with the right dominant arm; who could not work at unprotected heights or around dangerous machinery or open flames; and who needed to avoid concentrated exposure to noxious fumes, odors, respiratory irritants, extreme temperatures and humidity, would be capable of performing Ms. Klen's past work as a financial analyst. (*Id.*) If this same individual had difficulties getting up during the day and would miss more than two days

of work per month, however, she would not be a candidate for competitive employment. (R. 405-06.)

The VE next testified that if this same individual was limited to performing simple, unskilled work due to pain, medication side-effects and depression, she would not be capable of doing Ms. Klen's past work as a financial analyst. (R. 406.) The individual could, however, perform work as a clerical checker, clerical sorter and document preparer, and there are approximately 24,000 such jobs available in the Chicago metropolitan area. (R. 406-07.) If this individual was unable to use her dominant right arm, she could not engage in even sedentary work, which requires good use of both hands. (R. 407.) The VE explained further that if an individual's symptoms compromise her ability to be productive at least 80 percent of the workday, then she is not a candidate for competitive employment. (R. 408.)

E.     **The ALJ's Decision**

The ALJ found that Ms. Klen suffers from several severe impairments, including asthma, COPD, right carpal tunnel syndrome, arthritis in the left knee, bilateral heel spurs, degenerative disc disease of the cervical spine and obesity. None of these impairments, however, meets or equals one of the impairments listed in the Social Security Regulations. (R. 16-18.) The ALJ also concluded that "there is no evidence that [Ms. Klen's] depression and its impact on her functioning is of such severity that it renders her completely unable to function outside of her home." (R. 18.)

The ALJ held that Ms. Klen retains the residual functional capcity ("RFC") for sedentary work, with lifting and/or carrying no more than 10 pounds; walking and standing for approximately two hours in an eight-hour workday; sitting for six hours in an eight-hour workday; no pushing or pulling with her right dominant arm; no work at unprotected heights, or around dangerous machinery, open flames or bodies of water; and no concentrated exposure to noxious fumes, odors or other respiratory irritants. (R. 19-20.) The ALJ agreed that Ms. Klen's obesity aggravates her

asthma, arthritis, degenerative disc disease and heel spurs, and concluded that this provides further support for the sedentary RFC.  (R. 20.)

In reaching this conclusion, the ALJ noted that Ms. Klen's COPD, asthma and bronchitis are under good control with the nebulizer, and that her lungs were clear in both January and March 2006.  The ALJ acknowledged that Ms. Klen received an epidural steroid injection on October 17, 2006, but stressed Dr. DePhillips's April 12, 2006 report that she had no radiculopathy following a steroid injection he administered at that time.  (R. 21, 22.)  The ALJ agreed that Ms. Klen "undoubtedly may experience some pain, limitations, and restrictions from her impairments," but concluded that the objective medical record does not fully support her subjective complaints.  (R. 21, 24.)  He noted, for example, that she is able to drive for short distances and perform chores like cleaning, making beds and doing laundry.  In addition, the medical record demonstrated that Ms. Klen's allergic rhinitis was "markedly improved," and that the CPAP helps with her sleep apnea.  (*Id.*)

The ALJ credited Dr. Bokhari's January 2006 diagnosis of "mild" right median neuropathy and normal grip strength, noting that Ms. Klen was able to perform all hand dexterity movements and write her own name at that time.  The ALJ also noted the trigger point over Ms. Klen's right scapula, but emphasized that she had good range of movement as of March 2006.  (R. 22.)  As for Ms. Klen's right knee, the ALJ found that she has decreased range of motion, stiffness and pain.  He also agreed that she has palpable heel spurs with decreased sensation and position sense in both feet, as well as left Achilles tendinosis and right Achilles tendon insertion.  (*Id.*)  The ALJ noted Ms. Klen's fluctuating glucose levels, but disagreed that the medical record supports a finding that the diabetes is associated with neuropathy.  (R. 23.)

With respect to Ms. Klen's specific limitations, the ALJ discounted Dr. Bokhari's conclusion that Ms. Klen could lift and/or carry 10 pounds, finding it unsupported by the record.  Nevertheless, the ALJ limited Ms. Klen to performing sedentary work, which requires that she lift/carry at most 10

pounds at a time, and frequently lift less than 10 pounds. The ALJ gave "considerable weight" to the opinion of Dr. Jilhewar as "the most informed, convincing, consistent with the medical evidence, and consistent with the record as a whole, and generally consistent with the [RFC] I have assessed herein." (R. 23.) The ALJ also credited the VE's conclusion that Ms. Klen cannot perform her past work as a financial analyst, but that she can perform some 24,000 unskilled, sedentary clerical checker positions available in the Chicago region. (R. 24-25.)

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Ms. Klen is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

15

**B.     Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Ms. Klen raises four main arguments in support of her request for a reversal and remand: (1) the ALJ erred in concluding that her depression is not a severe impairment; (2) the ALJ erred in accepting the opinion of a consulting examiner over that of a treating specialist; (3) the ALJ erred in finding her testimony not entirely credible; and (4) the ALJ's decision is internally inconsistent at steps 4 and 5 of the analysis. The court addresses each in turn.

**1.     Ms. Klen's Depression**

Ms. Klen argues that the ALJ erred in finding that her depression is not a severe impairment. An impairment or combination of impairments is not severe "if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). *See also Arnold v. Barnhart*, 473 F.3d 816, 821 (7th Cir. 2007). "'Basic work activities' means the abilities and aptitudes necessary to do most jobs such as understanding, carrying out and

16

remembering simple instructions, using judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting." *Ferguson v. Astrue*, 541 F. Supp. 2d 1036, 1042 (E.D. Wis. 2008) (citing 20 C.F.R. § 404.1521(b)).

Ms. Klen first stresses that her GAF score consistently ranged from 50 to 60, which denotes "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See Christie v. Barnhart*, No. 04 C 3787, 2007 WL 2198937, at *13 n.24 (N.D. Ill. Jan. 16, 2007) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 34 (rev. 4th ed. 2000)). In Ms. Klen's view, the ALJ erred by finding her only mildly restricted in those areas. (Pl. Mem., at 10; R. 17.)

The GAF scale is not a diagnosis but is intended to be used to make treatment decisions. "Neither Social Security regulations nor case law require an ALJ to use a GAF score to determine the extent of an individual's disability." *Fisher v. Astrue*, No. 1:06-cv-1741-DFH-JMS, 2007 WL 4150314, at *6 (S.D. Ind. Nov. 14, 2007). Here, the ALJ expressly mentioned Ms. Klen's GAF scores but noted that her therapy sessions and medication have been relatively effective in controlling her symptoms of depression. (R. 17.) The ALJ also found it significant that Ms. Klen's GAF score progressively increased from 50 in November 2005 to 60 on August 30, 2006. He acknowledged a subsequent decrease in the score "apparently associated with pain and a S[ocial] S[ecurity] disability benefit decision," but by December 2006 it was back up to 60. (R. 18.) *See Rucker v. Barnhart*, No. 01 C 9168, 2003 WL 22715821, at *3 (N.D. Ill. Nov. 17, 2003) (GAF score of 51-60 was "consistent with the ALJ's conclusion that [the claimant's] depression was not a severe mental impairment.")

Moreover, the ALJ went on to explain his conclusion that Ms. Klen has only mild limitations in activities of daily living; social functioning; and concentration, persistence and pace. The ALJ did make an error in stating that Ms. Klen is able to perform household chores such as cleaning, making beds and doing laundry. The record reflects that Ms. Klen consistently reported that she

cannot engage in these activities. (Def. Resp., at 12 n.11.) Nevertheless, the ALJ accurately noted that Ms. Klen can drive for short distances and take showers, and that she is able to interact appropriately, effectively and independently with others. As an example, the ALJ cited an October 2006 treatment note stating that Ms. Klen was spending time with her sister and nephews, which helped with her depression. (R. 17-18.) The ALJ further noted that a mental status examination performed on January 18, 2006 showed Ms. Klen to have normal abstract reasoning and conceptual functioning; a normal ability to calculate and perform serial 7's for subtraction; and a normal affect with no signs of agitation, irritability or anxiety. (R. 18.) That examination also showed that Ms. Klen's behavior was appropriate and polite, and that she was able to relate clearly, concisely, and coherently without any apparent cognitive difficulties. The ALJ finally observed that there was no evidence that Ms. Klen experienced repeated episodes of decompensation. (*Id.*)

Ms. Klen objects that the ALJ failed to consider other relevant evidence that supports a finding of severe depression, such as the fact that she has trouble getting out of bed or completing even a few small tasks, and experiences feelings of hopelessness and guilt. (Pl. Mem., at 11; Pl. Reply, at 7.) The court agrees that an ALJ cannot select and discuss only that evidence which favors his ultimate conclusion. *Keys v. Barnhart*, 430 F. Supp. 2d 759, 773 (N.D. Ill. 2006) (citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)). At the same time, an ALJ need not address every piece of testimony and evidence in the record. *Id.* The ALJ expressly noted Ms. Klen's feelings of hopelessness and guilt, as well as her sleep disturbance and problems concentrating. (R. 17.) He concluded, however, that based on the entire record, Ms. Klen's depression "has no more than a minimal effect on the claimant's ability to do basic work activities." (*Id.*) *See Arnold*, 473 F.3d at 821; *Ferguson*, 541 F. Supp. 2d 1036, 1042.

Ms. Klen claims that the ALJ used an incorrect legal standard, noting the following statement at the conclusion of his step 2 analysis: "Careful consideration of the evidence of record reveals that there is no evidence that the claimant's depression and its impact on her functioning

18

is of such severity that it renders her completely unable to function outside of her home." (R. 18; Pl. Mem., at 11.) The court agrees that this is not the correct standard. It is clear from the remainder of the discussion, however, that the ALJ employed the proper standard in determining that Ms. Klen's depression is not severe – i.e., it does not significantly limit her ability to do basic work activities. (R. 17.)

The ALJ's determination that Ms. Klen's depression is not a severe impairment is supported by substantial evidence and is not a basis for reversal or remand.

### 2. The Medical Examiners

Ms. Klen next argues that the ALJ erred in accepting the opinions of Dr. Jilhewar over those of Dr. Bokhari and Dr. DePhillips, who both treated her. (Pl. Mem., at 14.) A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). A claimant is not disabled simply because his treating physician says so. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Id.* (*quoting Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

None of the three doctors at issue here is properly considered a treating physician. Dr. Jilhewar testified at the hearing as an ME, and he neither treated nor examined Ms. Klen. Dr. Bokhari and Dr. DePhillips both examined Ms. Klen, but on only one occasion each. *See White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (physician who examined the claimant once was a "nontreating source.") Ms. Klen contends that the ALJ nonetheless should have given the opinions of Dr. Bokhari and Dr. DePhillips greater weight because they are both neurological specialists, while Dr. Jilhewar is not. (Pl. Mem., at 14.)

### a. Dr. Bokhari

With respect to Dr. Bokhari, it appears that the ALJ largely adopted her opinion. Not only did he repeatedly cite the opinion throughout his decision, but he also gave Dr. Jilhewar's opinion "considerable weight." (R. 23.) As Ms. Klen acknowledges, Dr. Jilhewar testified that he agreed with Dr. Bokhari's conclusions in finding Ms. Klen limited to performing sedentary work. (*Id.*) Ms. Klen finds this outcome contradictory, on the theory that the ALJ affirmatively rejected Dr. Bokhari's opinion. Specifically, the ALJ stated:

> Consultative physician, Samina Bokhari, M.D., opined that the claimant could lift and/or carry less than 10 pounds (Exhibit 15F/7). I have not accorded any significant weight to Dr. Bokhari's opinion as it is not well supported by the other substantial medical evidence of record including [her] own objective findings.

(R. 23.) Viewing the statements in context, the court finds that the ALJ was expressing disagreement with Dr. Bokhari's opinion regarding Ms. Klen's ability to lift and carry, which is not inconsistent with his acceptance of the remainder of her analysis. The ALJ went on to acknowledge that his finding of a sedentary RFC would nonetheless limit Ms. Klen to "lifting/carrying at most 10 pounds at a time and less than 10 pounds frequently." (R. 23.) This RFC, however, was reasonably based on Ms. Klen's knee, heel and feet impairments, and not her restrictions on lifting and carrying. (R. 22.)

Ms. Klen claims that the ALJ inexplicably rejected other portions of Dr. Bokhari's opinion, including her conclusion that Ms. Klen is completely incapable of stooping. (R. 272.) "An ability to stoop occasionally; i.e., from very little up to one third of the time, is required in most unskilled sedentary occupations. A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999); *Maddox v. Astrue*, No. 4:07-cv-089-SEB-WGH, 2008 WL 2518618, at *2 n.1 (S.D. Ind. June 20, 2008); SSR 96-9p, at *8. Here, the ALJ found Ms. Klen capable of performing a variety of unskilled, sedentary jobs in the regional economy, but he did not ask the VE about any stooping limitations, or mention stooping in his decision.

The Commissioner suggests that the ALJ reasonably rejected the stooping limitation as inconsistent with Dr. Bokhari's other findings that Ms. Klen is capable of occasionally kneeling, crouching and crawling.  (Def. Resp., at 12-13; R. 272.)  Stooping is defined as "bend[ing] the body downward and forward by bending the spine at the waist."  *Qualkenbush v. Barnhart*, No. 01 C 8648, 2003 WL 22880838, at *8 (N.D. Ill. Dec. 5, 2003) (citing SSR 83-10, 1983 WL 31251, at *6). Crouching is defined as "bending both the legs and spine in order to bend the body downward and forward."  SSR 83-10, 1983 WL 31251, at *6.  In the Commissioner's view, "[i]t makes little sense that a person could be more limited in bending at the waist alone than they could be in bending at the waist and knees."  (Def. Resp., at 13.)

The problem with this argument is that the ALJ never mentioned any of Ms. Klen's postural limitations during the hearing or in his decision.  "[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for h[is] decision and [we] confine our review to the reasons supplied by the ALJ."  *Steele*, 290 F.3d at 941.  On the current record, the court cannot determine whether the ALJ imposed any specific postural limitations on Ms. Klen, much less that he reasonably rejected Dr. Bokhari's opinion that Ms. Klen is completely incapable of stooping.  The Commissioner stresses that state agency physician Dr. Bernet found Ms. Klen able to stoop occasionally.  (Def. Resp., at 13.)  Again, however, the ALJ did not specifically mention this February 2004 report, or explain why it is more persuasive than the conclusions of a neurological specialist some two years later.

To the extent a complete inability to stoop would "usually" render a person disabled, the ALJ's error in addressing this aspect of Dr. Bokhari's opinion cannot be deemed harmless.  *See Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.")  The case must therefore be remanded for further clarification of this issue.

**b.      Dr. DePhillips**

Ms. Klen also challenges the ALJ's apparent rejection of Dr. DePhillips's conclusion that Ms. Klen suffers from radiculopathy. (R. 311.) Dr. DePhillips did not provide a separate medical report evidencing this condition, but it is clear that he reviewed the March 7, 2006 cervical spine MRI in making his assessment. Specifically, Dr. DePhillips stated that Ms. Klen's

> MRI scan reveals degenerative disc disease at the C4-C5, C5-C6 and C6-C7 levels with osteophyte formation. At the C5-C6 level there is a fairly severe degenerative disc disease and foraminal stenosis bilaterally which I believe is the source of her radiculopathy.

(R. 311.) Dr. Jilhewar testified, conversely, that neither the June 2004 EMG/nerve conduction study nor the MRI evidenced any radiculopathy. (R. 381, 388-89.) In Dr. Jilhewar's view, the pain associated with degenerative disc disease and neuroparameter narrowing can be confused with carpal tunnel syndrome and ulnar entrapment. (R. 383.)

"In assessing conflicting medical opinion evidence, ALJs must consider a variety of factors, including whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). As the Seventh Circuit has explained, "[h]ow to weigh the opinions in a particular case is a question for the [Commissioner's] delegate, subject only to the rule that the final decision must be supported by substantial evidence." *Flowers v. Chater*, 107 F.3d 873 (7th Cir. 1997) (internal quotations omitted).

As noted, both Dr. Jilhewar and Dr. DePhillips are properly considered nontreating sources. Dr. DePhillips did see Ms. Klen on one occasion, but she herself testified that they "may have just talked." (R. 389.) *See White*, 415 F.3d at 658. At the same time, Dr. DePhillips is a neurological specialist, while Dr. Jilhewar is not. *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") In evaluating these nontreating sources, the ALJ noted that the March 2006 MRI report showed "moderate" bilateral neural foraminal narrowing, not

severe as stated by Dr. DePhillips. In addition, the report discussed "degenerative changes" but did not describe them as severe. (R. 23, 277.) Dr. Jilhewar's opinion is arguably consistent with this report, which was interpreted by another consulting physician, radiologist Steve R. Nudo. In addition, Dr. DePhillips agreed that Ms. Klen had "good motor strength in her upper extremities" following the epidural steroid injection, as well as "symmetrical deep tendon reflexes." (R. 311.) Less than three months earlier, Dr. Bokhari similarly observed that Ms. Klen had full grip strength and manual dexterity. (R. 272.)

Dr. DePhillips did state that Ms. Klen has radiculopathy, and he described her as a candidate for surgery. He also stated, however, that he would "wait until her symptoms worsen before considering either additional conservative treatment or surgical intervention." (R. 311.) Indeed, as of the date of his exam, Ms. Klen "require[d] no further treatment as she [wa]s neurologically intact and ha[d] no radiculopathy." (*Id.*) Ms. Klen never returned to Dr. DePhillips, but she apparently received two additional epidural steroid injections in October and early December 2006 that similarly provided her with relief. Dr. Jilhewar testified that Ms. Klen can receive such steroid injections "[e]very few months." (R. 401.) In addition, both Dr. Jilhewar and Dr. Bokhari placed limitations on Ms. Klen's ability to lift and/or carry, and push and pull with her right upper extremity, which would accommmodate her upper arm pain.

The court is satisfied that the ALJ properly weighed the opinions of Dr. DePhillips and Dr. Jilhewar, and his final decision in that regard is supported by substantial evidence.

### 3. Ms. Klen's Credibility

Ms. Klen next argues that the ALJ erred in finding her statements concerning the intensity, persistence and limiting effects of her impairments not entirely credible. (Pl. Mem., at 11.) In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold*, 473 F.3d at 822. If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the

individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ accepted that Ms. Klen experiences "some pain, limitations, and restrictions from her impairments," but found that the objective medical record "does not fully support and is not consistent with the claimant's subjective complaints." (R. 21.) Ms. Klen does not appear to dispute some aspects of the ALJ's credibility findings, including those related to her pain due to arthritis in her left knee; bilateral heel spurs; decreased sensation in both feet; stiffness, pain and decreased range of motion in the right knee joint; "chronic left achilles insertional tendinosis with calcific and osteophytic changes accompanied by a small tear"; calcinosis involving the right achilles tendon insertion; an antalgic gait; a slight limp towards the right side; and an inability to stand on tiptoes or heels or tandem walk. (R. 22.) Consistent with these findings, the ALJ limited Ms. Klen to performing sedentary work.

As for Ms. Klen's other impairments, Dr. Bokhari's January 18, 2006 exam revealed that her asthma, COPD and bronchitis were under good control with the use of a nebulizer one to two times per week, and her lungs were clear. (R. 21, 22.) The CPAP machine helped relieve the symptoms of sleep apnea, and her chronic allergic rhinitis was "remarkably improved" after her most recent visit with Dr. Khaja to address that condition in December 2003. (R. 21, 219.) Ms. Klen had a trigger point over her right scapula in March 2006, but she also had good range of movement in both shoulders. (R. 22.) With respect to Ms. Klen's carpal tunnel syndrome, the EMG revealed

only mild right median neuropathy, and Dr. Bokhari found that Ms. Klen has full manual dexterity and can make fists with both hands. The MRI confirmed moderate bilateral neural foraminal narrowing and some degenerative changes, but Ms. Klen had full relief following an epidural steroid injection in April 2006. She achieved similar relief from additional steroid injections she reported having in October and December 2006, and Dr. Jilhewar testified that she can get more shots "[e]very few months." (R. 401.)

Ms. Klen claims that the ALJ should have credited her testimony regarding arm pain because she "clearly had sought treatment for the condition." (Pl. Reply, at 10.) *See Grieves v. Astrue*, No. 07 C 4404, 2008 WL 2755069, at *17 (N.D. Ill. July 11, 2008) ("[F]ollowing a prescribed course of treatment can bolster a claimant's credibility.") As noted, however, that treatment (i.e., epidural steroid injections) provided her with full relief. *See Harper v. Chater*, No. 94 C 6759, 1995 WL 561142, at *4 (N.D. Ill. Sept. 19, 1995) (ALJ's rejection of the plaintiff's complaints of pain was supported by substantial evidence where, among other things, the plaintiff's pain symptoms were "relieved with medication and [her] response to the medication was good.") In addition, Ms. Klen never returned to Dr. DePhillips following her visit in April 2006. She testified that she "can't have surgery" because she "bleed[s] all over the place" and wakes up in the middle of the procedure, but there is no medical support for these assertions. (R. 401-02.)

Ms. Klen also argues that her complaints of pain are consistent with Dr. DePhillips's diagnosis of radiculopathy. (Pl. Mem., at 12.) As explained earlier, the ALJ did not err in discounting this opinion. Dr. DePhillips himself concluded that Ms. Klen "require[d] no further treatment," was "neurologically intact," and had "no radiculopathy" following the April 2006 epidural steroid injection, and he declined to consider further treatment "until her symptoms worsen." (R. 311.) Ms. Klen produced no medical records evidencing that her condition was worsening, or that she was experiencing further radiculopathy. Moreover, she acknowledged that the steroid

injections provided her with good relief.  Notably, Ms. Klen acknowledged that her arm pain during the hearing was unusual, and that she "almost never ha[s] a problem" lifting her arm.  (R. 359-60.)

The ALJ did err by repeating his assertion that Ms. Klen can perform chores like cleaning, making beds and doing laundry.  (R. 21.)  He accurately stated that Ms. Klen can drive for short distances, however, and there is no evidence that he based his finding of not disabled on this aspect of Ms. Klen's testimony.  To the contrary, the ALJ emphasized that Ms. Klen claims to be unable to type, write, open jars, pick up coins, button, zip and use utensils due to pain, numbness and tingling in her hands and fingers.  (*Id.*)  Yet Dr. Bokhari found that Ms. Klen has full manual dexterity and grip strength in both hands.

Ms. Klen also claims that her obesity and depression support her claims of disabling pain by "exacerbat[ing] other medical conditions" and making it difficult for her to "get[] motivated."  (Pl. Mem., at 12.)  As to the obesity, the ALJ agreed with Ms. Klen's position, stating:

> [I]t is reasonable to conclude that the claimant's obesity has the effect of aggravating her other medical conditions, specifically, her asthma, arthritis, degenerative disc disease, and heel spurs.  Thus, the effects of the claimant's obesity further support the residual functional capacity reached in this decision.

(R. 20.)  With respect to the depression, the ALJ noted that the therapy sessions and medications "have been relatively effective in controlling the claimant's symptoms."  (R. 17.)  He also observed that she spent time with her sister and nephews; and cited medical evidence that she is able to sustain focused attention and concentration, and interact appropriately and politely with others without cognitive difficulties or signs of agitation, irritability or anxiety. (R. 17, 267.)  Significantly, the ALJ limited Ms. Klen to simple, unskilled work to account for the effects of pain, medication side-effects and depression.  (R. 406.)  *See* 20 C.F.R. § 404.1568(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.")

Ms. Klen finally notes that she has an excellent work record and claims that the ALJ should have accepted her testimony because she is "not a person to exaggerate her limitations." (Pl. Mem., at 12.) The ALJ expressly acknowledged Ms. Klen's work history at the hearing, and he accepted many of Ms. Klen's subjective complaints to the extent they were supported by the medical record. (R. 358.) Thus, the court cannot say that the ALJ was "patently wrong" in choosing to discredit part of Ms. Klen's testimony in this case. *Schmidt*, 496 F.3d at 843 ("Because the ALJ is in the best position to observe witnesses, we will not disturb [his] credibility determinations as long as they find some support in the record.") (internal quotations omitted).

### 4.      Steps 4 and 5

Ms. Klen's last argument in support of reversal or remand is that the ALJ's decision is internally inconsistent. Specifically, she notes that the decision states both that "[t]he claimant is unable to perform any past relevant work," and that "I find that the claimant's past relevant work as a financial analyst did not require the performance of work-related activities precluded by the residual functional capacity reached in this decision." (R. 24.) The court agrees with the Commissioner that any error resulting from this ambiguity is harmless. *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Bacidore*, 2002 WL 1906667, at *10 ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.") The ALJ twice stated that Ms. Klen is unable to perform her past work as a financial analyst, suggesting that his contrary statement was an inadvertent mistake. Significantly, the ALJ continued to step 5 of the analysis to determine whether Ms. Klen could perform other jobs available in the regional economy, which is consistent with a step 4 finding that she is unable to perform her past work. (R. 24-25.)

Ms. Klen disagrees that this error was harmless, noting that the burden of proof at step 4 rests with the claimant, while the burden shifts to the Commissioner at step 5. (Pl. Reply, at 12.) To be sure, "if a disability determination reaches step five, the ALJ must discharge Commissioner's

27

burden of proof either by applying the Medical Vocational Guidelines or through use of a vocational expert." *Young v. Barnhart*, 282 F. Supp. 2d 890, 895 (N.D. Ill. 2003). Here, the ALJ relied on the VE's testimony at step 5, and there is no evidence that he improperly placed the burden of proof on Ms. Klen.

Ms. Klen also finds an ambiguity in the fact that the ALJ did not expressly state that she is limited to unskilled work. According to Ms. Klen, "[t]his fact casts serious doubt on the ALJ's view as a whole of Ms. Klen's ability to perform other jobs." (Pl. Reply, at 12.) The court disagrees. In his hypothetical question to the VE, the ALJ imposed a limitation to unskilled work. (R. 406.) The ALJ then accepted the VE's testimony that an individual with Ms. Klen's RFC can perform 24,000 "clerical checker (unskilled/sedentary) . . . jobs existing regionally." (R. 25, 406-07.) Even if Ms. Klen were capable of performing more than just unskilled work, the VE has identified a sufficient number of unskilled jobs within Ms. Klen's RFC to support the ALJ's finding of not disabled. *See Coleman v. Astrue*, 269 Fed.Appx. 596, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)) ("1,400 jobs falls within the parameters of a sufficiently significant occupational base.") The ALJ did not commit any reversible error at steps 4 or 5 of his analysis.

## CONCLUSION

The ALJ's decision is thorough and is supported by substantial evidence in most respects. For the reasons stated above, however, the ALJ failed to explain why he rejected a medical report stating that Ms. Klen is totally incapable of stooping which, if true, would likely render her unable to perform any sedentary work. Plaintiff's Motion for Summary Judgment or remand [Doc. 19] is therefore granted in part and denied in part. Defendant's Motion for Summary Judgment is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: July 25, 2008

_Nan R. Nolan_

NAN R. NOLAN
United States Magistrate Judge